Notice: This opinion is subject to formal revision before publication in the Federal Reporter or U.S.App.D.C. Reports. Users are requested to notify the Clerk of any formal errors in order that corrections may be made before the bound volumes go to press.

# United States Court of Appeals

FOR THE DISTRICT OF COLUMBIA CIRCUIT

————

Argued December 6, 2002      Decided July 11, 2003

No. 01-5383

JOHN L. FONTANA, LIEUTENANT COLONEL, AND
KEVIN P. MURPHY, LIEUTENANT COLONEL,
APPELLANTS

v.

THOMAS E. WHITE, SECRETARY OF THE ARMY,
APPELLEE

————

Appeal from the United States District Court
for the District of Columbia
(No. 00cv01732)

————

*Charles W. Gittins* argued the cause for appellants. With him on the briefs was *Louise Bouscaren McKnew.*

*Paul A. Mussenden*, Assistant U.S. Attorney, argued the cause for appellee. With him on the brief were *Roscoe C. Howard, Jr.*, U.S. Attorney, *R. Craig Lawrence*, Assistant

Bills of costs must be filed within 14 days after entry of judgment. The court looks with disfavor upon motions to file bills of costs out of time.

U.S. Attorney, and *Tara Osborn* and *Steven D. Bryant*, Counsel, Office of the Judge Advocate General.

Before: EDWARDS, ROGERS, and GARLAND, *Circuit Judges*.

Opinion for the Court filed by *Circuit Judge* GARLAND.

GARLAND, *Circuit Judge*: Appellants John L. Fontana and Kevin P. Murphy are lieutenant colonels currently serving on active duty as Army physicians at Walter Reed Medical Center in Washington, D.C. They began their military careers at the United States Military Academy at West Point in 1979, at which time each signed an agreement to complete a military service obligation in return for a free undergraduate education. After graduating from West Point in 1983, each appellant signed another agreement by which he incurred an additional service obligation in exchange for a free medical school education at the Uniformed Services University of the Health Sciences (USUHS). Both appellants subsequently signed further agreements prior to entering into additional government-subsidized medical training, including internships, residencies, and fellowships. Each appellant accepted, in his most recent such agreement, the Army's current calculation of the date on which his service obligation would end: for Fontana, April 1, 2005; for Murphy, March 29, 2006.

In May 1999, however, Fontana and Murphy submitted their resignations, contending that they had completed their respective service obligations. The Army disagreed, and refused to accept the resignations. The appellants then filed applications with the Army Board for the Correction of Military Records (ABCMR), requesting that their personnel records be amended to reflect their own calculations of their release dates. In separate decisions, the Board rejected the appellants' applications on the ground that the Army had correctly calculated their service obligations in accordance with the applicable statutes, regulations, and agreements. In particular, the Board held that each officer had committed himself to a twelve-year total obligation in return for his undergraduate and medical school education, against which his time in medical school did not count: a five-year obligation for West Point, to run consecutively with a seven-year

obligation for USUHS. Fontana and Murphy appealed the decisions of the ABCMR to the United States District Court for the District of Columbia, which granted summary judgment in favor of the Secretary of the Army.

The appellants now appeal to this court, offering two theories in support of the contention that they have already completed their service obligations: (1) that their West Point obligations ran concurrently with their seven-year USUHS obligations; and/or (2) that their four years in medical school counted against their West Point obligations. We reject both theories and affirm the judgment of the district court.

I

On review of a district court's grant of summary judgment in connection with the appeal of a decision of the ABCMR, "we review the ABCMR's decision *de novo*, applying the same standards as the district court." *Frizelle v. Slater*, 111 F.3d 172, 176 (D.C. Cir. 1997). The district court applied the deferential review standard of *Chevron U.S.A. Inc. v. Natural Res. Def. Council*, 467 U.S. 837 (1984), and the government contends that we should do the same. The appellants, by contrast, contend that we should show no deference to the Board. We need not resolve this dispute, however, because we conclude that the Board's decisions were correct regardless of the standard of review.

A

We begin our analysis with the statutes that govern the appellants' service obligations. The first of these is 10 U.S.C. § 4348, which sets forth the obligation that cadets incur in exchange for admission to the United States Military Academy. The relevant portion of the version of the statute that was in effect when the appellants entered West Point in 1979 reads as follows:

> (a) Each cadet . . . shall sign an agreement that, unless sooner separated, he will —
>
> > (1) complete the course of instruction at the Academy;
> >
> > (2) accept an appointment and serve as a commissioned officer of the Regular Army or the Regular Air

Force for at least the five years immediately after graduation; and

(3) accept an appointment as a commissioned officer as a Reserve for service in the Army Reserve or the Air Force Reserve and remain therein until the sixth anniversary of his graduation, if an appointment in the regular component of that armed force is not tendered to him, or if he is permitted to resign as a commissioned officer of that component before that anniversary.

10 U.S.C. § 4348 (1976).[1] Thus, pursuant to § 4348(a)(2), the appellants were required to agree that they would complete five years' service in the Regular Army in exchange for their West Point education. Each appellant signed an agreement that mirrored this statutory requirement. *See, e.g.*, Service Agreement, United States Military Academy (July 2, 1979), J.A. at 111 (Fontana).

In July 1983, the appellants resigned from the Regular Army and accepted appointments as active-duty officers in the Army Reserve, as required for entry into USUHS. *See* Appellee's Br. at App. 1, 5 (letters of resignation); *see also* Service Agreement, Uniformed Services University of the Health Services, J.A. at 109 (Murphy); *id.* at 110 (Fontana).[2]

---

[1] Both parties, and as a consequence the district court, cite a subsequent version of § 4348 that was not enacted until 1985 and hence is not relevant to the matter before us. *See* 10 U.S.C.A. § 4348 (West 1998) (providing the history of revisions to the statute). Some of the statutory language that the parties discuss in their briefs — most notably, the distinction between "active duty" and "commissioned" service obligations — did not exist in the earlier version, and we therefore do not address it in this opinion. *See United States Nat'l Bank of Oregon v. Indep. Ins. Agents of Am., Inc.*, 508 U.S. 439, 445–48 (1993) (holding that a court of appeals has authority to take into account changes in the law that have escaped the notice of the parties and the district court). In any event, the difference in language would not yield a different result in this case.

[2] The appellants returned to the Regular Army upon graduation from medical school, as required by ¶ 3 of their USUHS service agreements. J.A. at 109, 110.

According to the appellants' reading of § 4348(a)(3), their resignations relieved them of their obligation to serve five years in the Regular Army, imposing instead a requirement that they remain in the Army Reserve until the sixth anniversary of their West Point graduations. And nothing in the statute, the appellants maintain, precludes counting their time at USUHS toward the satisfaction of that obligation.

This argument might have merit if § 4348 and the West Point agreement were viewed in isolation, as though the appellants had entered into no further agreements and incurred no further obligations after graduating from West Point. But while § 4348 sets forth the minimum contractual terms to which each cadet must agree before entering West Point, it does not bar a graduate from agreeing to extend the service obligation that § 4348 requires in exchange for additional free education — as Fontana and Murphy did here. To the contrary, such subsequent agreements are authorized by at least two other statutes, to which we now turn.

The statute that generally governs the Secretary of the Army's authority to enter into contracts concerning the provision of "advanced education assistance" is 10 U.S.C. § 2005. That section states, in relevant part:

> (a) The Secretary concerned may require, as a condition to the Secretary providing advanced education assistance to any person, that such person enter into a written agreement with the Secretary concerned under the terms of which such person shall agree —
>
> > (1) to complete the educational requirements specified in the agreement and to serve on active duty for a period specified in the agreement;
> >
> > . . . and
> >
> > (4) to such other terms and conditions as the Secretary concerned may prescribe to protect the interest of the United States.
>
> (b) The Secretary concerned shall determine the period of active duty to be served by any person for advanced education assistance to be provided such person by an armed force, except that if the period of active duty required to be served is specified under another provi-

sion of law with respect to the advanced education assistance to be provided, the period specified in the agreement referred to in subsection (a) shall be the same as the period specified in such other provision of law.

10 U.S.C. § 2005 (1982).

Section 2005(a) clearly authorizes the Secretary of the Army to require that a student, as a condition of receiving advanced education assistance, agree to such terms as the Secretary may prescribe to protect the interest of the United States. And § 2005(b) specifically authorizes the Secretary to determine the period of active duty to be served by the student in exchange for such advanced education assistance. These grants of authority are broad enough to permit the Secretary to require, as terms of the agreement, that time in medical school not count toward preexisting service obligations like those incurred by the appellants at West Point, and that such preexisting obligations be served consecutively with the additional obligations incurred in return for medical education. As we discuss in Part I.B, the Secretary did in fact include those terms in the appellants' USUHS agreements.

Fontana and Murphy contend, however, that the Secretary's authority to specify such terms is restricted by the "except" clause of § 2005(b): the Secretary is permitted to determine the period of active service to be served in exchange for advanced education assistance to be provided to the individual "*except* . . . if the period of active duty required to be served is specified under another provision of law with respect to the advanced education assistance to be provided." *Id.* (emphasis added). The appellants argue that because the period of active duty required of West Point graduates was specified "under another provision of law," namely § 4348(a), the Secretary was without authority to alter or extend it. But this argument ignores the balance of the relevant language of § 2005(b). Section 4348(a) is indeed a "provision of law" that specifies the period of active service required for the education assistance that *was provided* appellants under their West Point agreements. But it plainly does not specify

the period of required active duty service "with respect to the advanced education assistance" that was "*to be provided*" to the appellants under their subsequent USUHS agreements. When the parties entered the USUHS agreements, the assistance "to be provided" was the appellants' medical school education; their West Point education had already been provided.

The statute that sets forth the obligations of USUHS students is 10 U.S.C. § 2114, which states in relevant part:

> Students who graduate [from USUHS] shall be required ... to serve thereafter on active duty under such regulations as the Secretary of Defense ... may prescribe for not less than seven years, unless sooner released.

10 U.S.C. § 2114(b). This language establishes two important points. First, as the appellants concede, it imposes a minimum seven-year service obligation that does not begin to run until after graduation from USUHS ("to serve thereafter"). Second, just as § 2005 generally authorizes the Secretary of the Army to prescribe the terms of the service agreements required of those who accept advanced education assistance, § 2114(b) specifically authorizes the Secretary of Defense to prescribe regulations to govern the active duty service requirements of those who graduate from USUHS. It is to those agreements and regulations that we now turn.

B

In July 1983, Fontana and Murphy each entered into an agreement with the Army as a condition of their enrollment in medical school at USUHS. Paragraph 3 of that contract required the appellants to accept Regular Army commissions upon graduation. Paragraph 4 set forth the relationship between the appellants' seven-year USUHS obligations and their unfulfilled West Point obligations:

> I understand that my unfulfilled service obligation incurred as a result of my participation in ... USMA [the U.S. Military Academy] ... *will be served consecutively with* the service obligation incurred by my participation

in the medical program of the Uniformed Services University of the Health Sciences.  This obligation will be served in addition to internship and residency training in accordance with the policy of the military service in which I am appointed.  I acknowledge that my remaining service obligation incurred prior to entry into the medical program is 24 May 88, and that this service obligation *will extend the service obligation* incurred as a result of my participation in the medical program.

J.A. at 109, 110 (emphasis added).  The language of this agreement clearly disposes of the first of the appellants' two theories:  that the two service obligations could be served concurrently, rather than consecutively.  As the language expressly states, the parties agreed that the two obligations would be "served consecutively."

The wording of the USUHS agreement also undercuts the appellants' other theory:  that a student's four years of medical school count against his West Point obligation.  Although it would not be impossible to construe the phrase "will be served consecutively with" to permit the West Point obligation to run during (and somewhat beyond) the four years of medical school, with the seven-year USUHS obligation commencing thereafter, the sentence structure suggests a contrary reading.  The more likely meaning of the locution "X is consecutive with Y" is that X comes after Y — in this case, that the West Point obligation only begins to run after the seven-year USUHS obligation is completed.  This reading is also supported by the last sentence quoted above, which states that the West Point obligation will "extend" the USUHS obligation.

Any lingering ambiguity in the language of the agreement is dispelled by the governing regulation.  *See Cole v. Burns Int'l Sec. Servs.*, 105 F.3d 1465, 1485–86 (D.C. Cir. 1997) (holding that courts should prefer an interpretation that makes a contract lawful).  Department of Defense (DoD) Directive 6000.2, issued on March 19, 1981 and applicable to all military departments, sets forth policies pertaining to the

service obligations of persons receiving health-related education from the military. Section F(1) of the directive states:

> 1. Payback of a Prior Obligation. No portion of a prior obligation arising out of the expenditure of government funds for education or training purposes may be satisfied during any period of long-term health or health-related education or training.

DoD Directive 6000.2, at § F(1) (Mar. 19, 1981). This language could not be clearer, and plainly bars any portion of Fontana's or Murphy's West Point obligation (a "prior obligation arising out of the expenditure of government funds for education") from being satisfied during his medical school years ("any period of . . . health-related education").[3] Likewise, § F(2) of the directive confirms the conclusion that the West Point and USUHS obligations may not be served concurrently:

> 2. Payback of an ADO [active duty obligation] incurred under the Provisions of this Directive. No portion of an ADO may be satisfied . . . [c]oncurrently with any other ADO or with an obligation incurred for DoD-subsidized preprofessional (undergraduate) education. . . .

*Id.* § F(2).

In response, the appellants rely on Army Regulation (AR) 350-100, which, they contend, conflicts with the directive by requiring that their obligations run concurrently and that

---

[3] Although the appellants do not dispute the clarity of this language, they point to what they regard as a contradictory provision of the same section: "Nothing in this Directive shall be used to change an ADO [active duty obligation] or an active duty agreement entered into in writing by a health services officer before the date of the implementation of this Directive." DoD Directive 6000.2, at § F. That provision has no relevance here, however, because the appellants were not "health services officer[s]" when they entered into their West Point agreements. In any event, § F(1)'s bar against satisfying prior obligations during health-related training does not "change" those obligations; it simply specifies the relationship between the prior obligations and those subsequently incurred.

their medical school time count against their West Point obligation. *See* AR 350-100, at ¶¶ 3-3, 3-4.[4] We need not determine whether the appellants' interpretation of the language of AR 350-100 is correct as applied to the service obligations of other Army officers, however, because it does not govern the obligations of physicians like Fontana and Murphy. Paragraph 1-7(b) of AR 350-100, headed "Applicability," states: "Specific policies on service obligations for Army Medical Department (AMEDD) officers are in AR 351-3." AR 350-100, at ¶ 1-7(b). Accordingly, at least to the extent that the two regulations conflict, the duties of Army Medical Department officers like the appellants are specified not by AR 350-100, but rather by AR 351-3, paragraph 7-1 of which confirms that it is the regulation that "prescribes the policies governing active duty obligations . . . incurred for participation in . . . health related education and training programs." AR 351-3, at ¶ 7-1 (Appellee's Br. at App. 18). The relevant provisions of the latter regulation are ¶¶ 7-3(B) and (C), which repeat the language of §§ F(1) and (2) of DoD Directive 6000.2 almost verbatim. And because the provisions of AR 351-3 are identical to those of the directive, they provide no support for the appellants' claims and instead support the Army's position.[5]

---

[4] Because the text of older versions of this regulation is difficult to locate, we use the text provided by the parties, which is dated April 1994. We assume, because the parties do not suggest otherwise, that the 1994 version of the regulation is not materially different from the regulation that was in effect when the appellants entered medical school in 1983.

[5] The appellants argue that AR 351-3 was not considered by the ABCMR, and that a court therefore cannot consider it in support of the Board's decisions. *See Securities Exch. Comm'n v. Chenery Corp.*, 332 U.S. 194, 196 (1947). We are not certain that the factual premise of this argument is correct, as the Board stated that it had considered all "applicable law and regulations." J.A. at 70, 88. But even if the Board did not consider AR 351-3 specifically, it did expressly rely on Directive 6000.2. And since the two provisions are identically worded, there is no reason for a remand because there is no "significant chance that . . . the agency might have

In sum, the relevant Army regulation is consistent with the DoD Directive, and both make clear that the time the appellants spent immersed in their medical books did not count against their West Point obligations. Similarly, the regulation and directive bar the West Point and medical school service obligations from being served concurrently. The governing regulations thus support the ABCMR's reading of the USUHS contract.

## C

Finally, we note that additional support for the ABCMR's determination of the service obligations of the appellants is provided by several subsequent agreements, pursuant to which Fontana and Murphy further extended their obligations in exchange for post-graduate training including internships, residencies, and fellowships. Murphy entered into his last such agreement in March 1994, prior to beginning a fellowship in reconstructive surgery. Murphy's training agreement provided as follows:

> 6. I understand that my current ADO [active duty obligation] expires on April 29, 2004. By acceptance of this GPE [graduate professional education] training, *I agree that my ADO, upon successful completion of this training, will terminate on March 29, 2006 . . . .*

Appellee's Br. at App. 4 (emphasis added). Fontana signed an agreement with identical language, albeit with a different release date (April 1, 2005), when he entered subspecialty training in pediatric anesthesiology in 1991. *Id.* at App. 7. Although both appellants apparently attached letters disputing the specified release dates,[6] they nonetheless signed the

---

reached a different result" had it considered the former as well as the latter. *National Mining Ass'n v. Dep't of Interior*, 251 F.3d 1007, 1014 (D.C. Cir. 2001) (quoting Henry J. Friendly, Chenery *Revisited: Reflections on Reversal and Remand of Administrative Orders*, 1969 DUKE L.J. 199, 211).

[6] None of the parties included the letters in the Joint Appendix submitted on appeal; the briefs describe them in only the most general terms.

agreements and ultimately accepted the government-funded training notwithstanding the Army's failure to acknowledge their letters.

Fontana and Murphy now contend that the release dates included in their training agreements were unlawful, and that they in fact completed their service obligations in May 1999. The appellants agree that their post-medical-school training did not count toward the fulfillment of their prior obligations, and do not dispute the Army's calculation of the amount by which that training extended those prior obligations. Their disagreement with the release dates is based solely on their rejection of a twelve-year combined West Point/USUHS service obligation, which provided the starting point for the Army's calculations. By entering into these agreements, however, the appellants accepted those calculations. Nothing compelled or coerced the appellants to sign the agreements; having done so and received the benefit of their bargains, the appellants cannot now dispute the terms to which they voluntarily agreed.

Nor was there anything unfair about the bargains the appellants struck. If we were to accept the appellants' argument that they satisfied their West Point obligations during their four years of medical school, they would each owe only one more year of service[7] than their medical school classmates who did not attend West Point and who received four fewer years of government-funded education. And if we

---

[7] As discussed in Part I.A., the appellants, citing 10 U.S.C. § 4348(a)(3), contend that when they resigned their commissions to enter medical school, they were relieved of the five-year Regular Army service obligation they had incurred upon graduation from West Point, and instead incurred a six-year Army Reserve obligation that began running immediately. The Army, in contrast, argues that attendance at USUHS simply put the appellants' five-year Regular Army obligation on hold until their USUHS graduation, whereupon their consecutive five- and seven-year obligations began to run. Both parties agree, however, that if we reject the appellants' theory that the West Point obligation was satisfied during medical school, that component of their total obligation should be regarded as five and not six years.

were to accept their alternative argument that the two service obligations were served concurrently, they would owe *no* additional service for their free undergraduate education. Such a windfall would be inconsistent with one of the Army's primary purposes, as stated in the regulations, for requiring such obligations in exchange for educational assistance: ensuring "a reasonable return to the Army following the expenditure of public funds." AR 350-100, at ¶ 7(a)(4); *cf. Schaefer v. Cheney*, 725 F. Supp. 40, 49 (D.D.C. 1989) (stating that "one of the fundamental purposes of requiring" service obligations is to provide the Army with "a fair *quid pro quo* for [its] investment in personnel"). It is hardly unfair for the Army to insist that the appellants complete separate service obligations in exchange for each stage of their government-funded education.

## II

We conclude that the agreements entered into by the appellants in return for their undergraduate and medical school educations bound them to twelve-year service obligations, against which the time they spent in medical school did not count and that were further extended by their post-graduate training. We therefore find that the Army Board for the Correction of Military Records correctly resolved the appellants' challenges to the Army's calculation of their release dates. Accordingly, the district court's grant of summary judgment in favor of the appellee is

*Affirmed.*