# United States Court of Appeals
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

Argued October 21, 2011        Decided May 25, 2012

No. 10-5350

TRENT M. COBURN,
APPELLANT

v.

JOHN M. MCHUGH, HONORABLE, SECRETARY OF THE ARMY,
APPELLEE

Appeal from the United States District Court
for the District of Columbia
(No. 1:09-cv-01266)

*Raymond J. Toney* argued the cause and filed the briefs for appellant. *David P. Sheldon* entered an appearance.

*Daniel J. Everett*, Special Assistant U.S. Attorney, argued the cause for appellee. On the brief were *Ronald C. Machen Jr.*, U.S. Attorney, and *R. Craig Lawrence* and *Alan Burch*, Assistant U.S. Attorneys. *Kelly L. McGovern*, Special Assistant U.S. Attorney, entered an appearance.

Before: BROWN and GRIFFITH, *Circuit Judges*, and EDWARDS, *Senior Circuit Judge*.

EDWARDS, *Senior Circuit Judge*: After nearly eighteen years of service in the United States Army, Appellant Trent Coburn was involuntarily separated on October 30, 2002, pursuant to the Army Qualitative Management Program

("QMP") for an unfavorable Noncommissioned Officer Evaluation Report ("NCOER") and a record of nonjudicial punishment under Article 15 of the Uniform Code of Military Justice ("UCMJ"). Prior to his separation, Coburn had undergone repeated medical evaluations for back problems and pulmonary issues. In an effort to address Coburn's medical issues, the Army had initiated a Medical Evaluation Board ("MEB"), a process used to determine whether a soldier is medically qualified for retention in the service. *See* Army Reg. 635-40 ¶ 4-10 (2012). On October 30, 2002, Coburn's MEB processing was purportedly terminated. Orders were published on the same day directing Coburn's discharge under the QMP.

Coburn challenged the termination of the MEB process in two actions before the Army Board for Correction of Military Records ("the ABCMR" or "the Board"), which in each case rejected his claims. The first of these actions was filed on December 5, 2002. Coburn asserted that his separation from the service resulted from an improper termination of the MEB process. He requested reinstatement to allow the MEB process to continue. On August 21, 2003, the ABCMR rejected Coburn's claims. The second action was filed on January 5, 2006. In this action, Coburn sought reconsideration of the Board's 2003 decision. He asserted: (1) that the physician who had terminated his MEB did not have the authority to do so; and (2) that no medical justification existed to terminate the MEB. On March 7, 2007, the ABCMR denied Coburn's request for reconsideration. Coburn did not specifically challenge the QMP action in his 2002 and 2006 applications to the ABCMR.

On July 7, 2009, Coburn filed suit in the District Court against the Secretary of the Army ("the Secretary"), invoking the court's jurisdiction under 28 U.S.C. § 1331, and raising claims under the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 704, 706 (2006), to challenge the Board's August 21, 2003 and March 7, 2007 decisions. The District Court granted

the Secretary's motion to dismiss or, in the alternative, for summary judgment, and denied Appellant's cross-motion for summary judgment. *Coburn v. McHugh*, 744 F. Supp. 2d 177 (D.D.C. 2010).

On appeal, Appellant first contends that the District Court erred in dismissing his claim challenging his separation under the QMP for failure to "meet Army standards." Army Reg. 635-200 ¶ 19-2(a) (2011). Coburn argues that because an Administrative Separation Board ("ASB") found that a preponderance of the evidence did not support the allegation that he had wrongfully used marijuana – which was the ground upon which the Article 15 action was based – his separation under the QMP was unlawful. The District Court found, *see Coburn*, 744 F. Supp. 2d at 182–83, and we agree, that because Coburn did not specifically challenge the QMP action in his 2002 or 2006 applications to the ABCMR, the matter is not properly subject to judicial review.

Appellant's second contention on appeal pertains to the termination of his MEB process. Appellant asserts that the ABCMR and the District Court erred in finding that the doctors who terminated his MEB process had the authority to do so, and that the medical evidence in the record supported the decision to terminate. Relatedly, Appellant contends that, under established Army procedures, his QMP separation should have been stayed pending completion of his MEB processing. The Secretary does not dispute this last point, but argues that the physicians who handled Appellant's case made a well-founded decision not to refer Coburn to a MEB, so there was no improper termination of any MEB process. The parties thus disagree over whether Coburn was referred to a MEB. The record clearly indicates that the MEB process had been "initiated," but the Secretary contends that initiation is not the same as a referral to a MEB. The ABCMR decisions do not address whether Coburn's case was referred to a MEB, and, if so, how Appellant's physicians

(who were not members of a MEB) could terminate a case that had been submitted to the MEB process. And the ABCMR decisions fail to explain how the medical information in the record justified the termination of Coburn's MEB process when no final decision had been issued by a MEB. Because the ABCMR's decisions are largely incomprehensible on these points, they are unworthy of any deference. Accordingly, we reverse the decision of the District Court on the MEB issue and instruct the trial court to remand the case to the ABCMR for further proceedings consistent with this opinion.

## I. Background

### A. The QMP Separation

On March 24, 2000, after urinalysis showed that Appellant tested positive for marijuana, he was found guilty of wrongful use of marijuana pursuant to the nonjudicial punishment proceedings of Article 15 of the UCMJ. On October 25 and 26 of that year, Coburn appeared before an ASB that was convened to determine whether to separate Appellant from the service for the "commission of a serious offense" in violation of Army Regulation 635-200, Chapter 14, Section III, Paragraph 14-12c. Mem. for Major Willie Chandler (Sept. 1, 2000), *reprinted in* J.A. 130. The ASB found that the allegation that Coburn had "wrongfully used marijuana . . . [was] not . . . supported by a preponderance of the evidence" and recommended that he "be retained in the service." Findings and Recommendations, Administrative Board, J.A. 131. However, the ASB did not mention the Article 15 action. Coburn then pursued various avenues of appeal in an effort to have the Article 15 action expunged from his record or moved to a restricted fiche data file; but his petitions for relief were rejected at every turn.

On August 25, 2000, Coburn received an unfavorable NCOER for the rating period of August 1999 to July 2000. *See* NCO Evaluation Report, Aug. 25, 2000, J.A. 223–24. The

evaluation stated that Coburn needed much improvement in leadership; noted that he had failed a urinalysis test; indicated that he "uses poor judgment" and that his "leadership [was] marred by actions unbecoming a noncommissioned officer"; and concluded that his "[o]verall potential for promotion and/or service in positions of greater responsibility" was only "fair." *Id.*, J.A. 224.

On April 20, 2001, pursuant to the QMP, Coburn was selected for separation from service and barred from reenlistment by a Master Sergeant Promotion Board. The Promotion Board considered Coburn's record of service, including performance and future potential for retention in the Army. The grounds for Coburn's separation were (1) his poor NCOER for the rating period of August 1999 through July 2000 and (2) the Article 15 action. *See* Mem. for Sergeant First Class Trent M. Coburn (Apr. 20, 2001), J.A. 142.

Coburn subsequently submitted several applications to the ABCMR, to which a soldier may appeal when he believes his record contains an error or injustice. *See* 10 U.S.C. § 1552(a)(1) (2006); Army Reg. 15-185 ¶ 2-10(c) (2006). In the first of these applications, Coburn requested that the ABCMR remove the Article 15 action and the NCOER from his personnel file. He asserted that both negative records "resulted from the erroneous [c]onclusion that [he] wrongfully used marijuana"; he also pointed out that he had been "vindicated" by the ASB. ABCMR Appl., Aug. 24, 2001, J.A. 126.

On March 28, 2002, the ABCMR rejected Coburn's August 21, 2001 application, finding that he presented "no evidence . . . that the Article 15 was in error or unjust." The Board thus declined to expunge the reference to the Article 15 action from Appellant's personnel file or to move the reference to a restricted fiche data file. ABCMR Mem. of Consideration (Mar. 28, 2002) ("2002 Decision") at 7, J.A. 122. The Board also found that there was "no basis to remove or amend the contested

NCOER." *Id.*

**B. The MEB Process**

In March 2002, because of his recurring medical problems, Dr. Mario Caycedo "initiated [a] MEB for Mr. Coburn." Caycedo Decl. ¶¶ 2, 2(c), Sept. 3, 2009, J.A. 172–73. The Army thereafter determined that Coburn "did not meet medical retention standards in accordance with Army regulations." Letter from Brian J. Storm, First Lieutenant, U.S. Army, to Hon. Chet Edwards, Representative in Congress (July 17, 2002) ("Storm Letter"), J.A. 112. Coburn was thus "eligible for processing through the Physical Disability System. On July 2, 2002, he was referred to process through the MEB by the Brigade Surgeon." *Id.* The MEB process is used to determine whether a solider is medically qualified for retention in the Army. *See* Army Reg. 635-40 ¶ 4-10. Because the MEB process generally takes precedence over administrative separation procedures, Coburn could not be separated pursuant to the QMP so long as the MEB process was ongoing. *See* Army Reg. 635-200 ¶ 1-33.

On October 30, 2002, Dr. Caycedo discussed Coburn's case with Colonel Wayne Schirner, also an Army physician. Caycedo Decl. ¶ 2(i), (l), (m), J.A. 174–75. Although both doctors had familiarity with Coburn's case, neither was on a MEB assigned to determine whether Coburn was medically qualified for retention. Nonetheless, after reviewing Coburn's medical record, Dr. Schirner and Dr. Caycedo "agreed . . . to terminate Mr. Coburn's MEB." *Id.* ¶ 2(m), J.A. 175. Dr. Caycedo then wrote a letter to Coburn's Physical Evaluation Board Liaison Officer, instructing that "MEB action on SFC Coburn" should be "terminate[d]," because Coburn's "medical issues are stable and maybe [sic] followed by the VA [Veterans Affairs] system once the soldier leaves the military." Letter from Dr. Mario Caycedo to Mr. Hurst (Oct. 30, 2002) ("Caycedo Letter"), J.A. 109. Coburn was involuntarily

separated from the service on the same day.

On December 5, 2002, Coburn filed an application with the ABCMR, asserting that he was discharged due to the improper termination of the MEB and requesting reinstatement to allow the MEB process to continue. ABCMR Appl., Dec. 5, 2002, J.A. 104. The Board rejected Appellant's application, explaining in part:

> The applicant has not provided any good reason to reinstate him on active duty in order to complete physical disability processing. The scant medical information available does not indicate that the applicant was medically unfit for retention, nor is there evidence that the physical disability processing was unjustly terminated. Competent medical authority determined that his medical condition was such that he could be discharged. He has provided no medical evidence to indicate otherwise.

ABCMR Mem. of Consideration (Aug. 21, 2003) ("2003 Decision") at 6, J.A. 82. In his December 5, 2002 application to the ABCMR, Appellant referenced the Article 15 action; but he did not seek to challenge this action and the Board did not rule on it.

On January 5, 2006, Coburn applied to the ABCMR for reconsideration. He claimed: (1) that "[t]he doctor who terminated the MEB had no authority to do so," and (2) that "[t]here was no medical justification to terminate the MEB." Req. for Recons., Jan. 5, 2006, J.A. 66. Coburn requested the Board to "rescind the discharge orders and correct his records by granting him medical retirement based on the current rating from the Department of Veteran's Affairs of 50% disability"; or, in the alternative, to "correct his records to reflect 20 years of service, entitling him to a length of service discharge"; or, "[i]n the further alternative," to "correct his records by returning the processing of his case to the MEB stage, allowing the medical

processing to take its course." *Id.*, J.A. 64.

Appellant's January 5, 2006 application for reconsideration referenced his NCOER and the Article 15 action. But as with his December 5, 2002 application to the Board, Appellant did not explicitly challenge these actions. On March 7, 2007, the ABCMR rejected Appellant's application for reconsideration. *See* ABCMR R. of Proceedings (Mar. 7, 2007) ("2007 Decision") at 4, J.A. 59. The Board found that the "overall merits of the case . . . are insufficient as a basis for the Board to reverse its previous decision." *Id.* at 3, J.A. 58.

Coburn filed suit in District Court against the Secretary on July 7, 2009, seeking review under the APA of the ABCMR's 2003 Decision and its 2007 Decision. *Coburn*, 744 F. Supp. 2d at 181. He sought a "declaratory judgment that the Army unlawfully separated him for marijuana use, that the Army unlawfully terminated his disability evaluation, that Army regulations prohibited his separation, and that the ABCMR's decision-making process did not comply with statutory authority or Army regulations." *Id.*

The Secretary filed a motion to dismiss or, in the alternative, for summary judgment; Coburn filed a cross-motion for summary judgment. *Id.* at 179. The District Court granted judgment in favor of the Secretary. *Id.* Coburn appeals, arguing that the "District Court improperly dismissed [his] claim that his separation for alleged marijuana use under the Army [QMP] was unlawful," and that the "District Court and the ABCMR erred in ruling that the Army's termination of [his] physical disability evaluation processing was lawful." Appellant's Br. at 2.

## II. Analysis

### A. Standard of Review

There are several venerable legal principles that control our review and disposition of this appeal. First, "[o]n review of a

district court's grant of summary judgment in connection with the appeal of a decision of the ABCMR, 'we review the ABCMR's decision *de novo*, applying the same standards as the district court.'" *Fontana v. White*, 334 F.3d 80, 81 (D.C. Cir. 2003) (citation omitted). The same is true for a motion to dismiss. *See Miller v. Hersman*, 594 F.3d 8, 10 (D.C. Cir. 2010) ("We review *de novo* both a summary judgment and a dismissal for failure to state a claim." (citations omitted)). Relatedly, "[i]n a case like the instant one, in which the District Court reviewed an agency action under the APA, we review the administrative action directly, according no particular deference to the judgment of the District Court." *Holland v. Nat'l Mining Ass'n*, 309 F.3d 808, 814 (D.C. Cir. 2002) (citations omitted). In other words, we "do not defer to a district court's review of an agency [action] any more than the Supreme Court defers to a court of appeals' review of such a decision." *Novicki v. Cook*, 946 F.2d 938, 941 (D.C. Cir. 1991) (citation omitted).

Second, "[s]imple fairness to those who are engaged in the tasks of administration, and to litigants, requires as a general rule that courts should not topple over administrative decisions unless the administrative body not only has erred but has erred against objection made at the time appropriate under its practice." *United States v. L.A. Tucker Truck Lines, Inc.*, 344 U.S. 33, 37 (1952). Therefore, we are bound to adhere to the "hard and fast rule of administrative law, rooted in simple fairness, that issues not raised before an agency are waived and will not be considered by a court on review." *Nuclear Energy Inst. v. EPA*, 373 F.3d 1251, 1297 (D.C. Cir. 2004) (per curiam) (citations omitted).

Third, it is generally understood that "decisions regarding the correction of military records are reviewable under the 'arbitrary and capricious' standard of APA § 706." *Kreis v. Sec'y of the Air Force*, 866 F.2d 1508, 1513 (D.C. Cir. 1989) (citing *Chappell v. Wallace*, 462 U.S. 296, 303 (1983)); *see also*

*Dickson v. Sec'y of Def.*, 68 F.3d 1396, 1404 (D.C. Cir. 1995) (applying 5 U.S.C. § 706 specifically to decisions of the ABCMR). Typically, we are guided by the "strong but rebuttable presumption that administrators of the military, like other public officers, discharge their duties correctly, lawfully, and in good faith." *Frizelle v. Slater*, 111 F.3d 172, 177 (D.C. Cir. 1997) (citations omitted) (internal quotation marks omitted). However, an agency decision is owed no deference if it fails to "give a reason that a court can measure . . . against the 'arbitrary or capricious' standard of the APA." *Kreis*, 866 F.2d at 1514–15; *see also Tripoli Rocketry Ass'n, Inc. v. Bureau of Alcohol, Tobacco, Firearms, and Explosives*, 437 F.3d 75, 77 (D.C. Cir. 2006) (explaining that "no deference" is owed to an agency's "purported expertise" where its explanation "lacks any coherence").

## B. Appellant's QMP Claims

Coburn's first argument on appeal is that the District Court erred when it declined to address and dismissed his claim that his separation under the Qualitative Management Program was unlawful. The District Court refused to consider this claim after finding that Appellant did not expressly raise it in the administrative proceedings under review here. Appellant challenges this finding, arguing that "he did expressly raise [the QMP claim] in a 2001 application and the ABCMR expressly incorporated the record of that decision into Mr. Coburn's subsequent ABCMR applications. The ABCMR itself thus preserved the issue." Appellant's Br. at 14. Appellant's argument is belied by the record.

Coburn filed applications with the ABCMR in 2001, 2002, and 2006, all of which were denied, in 2002, 2003, and 2007, respectively. His 2001 application was the only one in which Appellant challenged the QMP. And Appellant did not seek judicial review of the Board's 2002 decision rejecting his 2001 application. His current appeal to this court regards only the

Board's 2003 Decision and its 2007 Decision, and those decisions did not address issues relating to the QMP because Appellant did not raise the issues in his 2002 and 2006 applications to the Board. We agree with the District Court that Coburn's 2002 and 2006 applications "focused on what Coburn described as the improper termination of his MEB." *Coburn*, 744 F. Supp. 2d at 182 (citation omitted). Therefore, the District Court did not err in dismissing Appellant's QMP claim. The "well-established doctrine of issue waiver . . . permits courts to decline to hear arguments not raised before the agency where the party had notice of the issue." *CSX Transp., Inc. v. Surface Transp. Bd.*, 584 F.3d 1076, 1079 (D.C. Cir. 2009) (citations omitted).

Appellant admits that the application giving rise to the ABCMR's 2003 decision "did not specifically address the issue of the Article 15 and his alleged marijuana use." Appellant's Br. at 28. The ABCMR's denial in response to that application, in turn, is based wholly on its findings regarding the MEB. *See* 2003 Decision at 6, J.A. 82. It is not surprising, then, that Appellant's subsequent 2006 application for reconsideration focused on the very same issue that was the subject of the prior application and denial: the MEB termination. *See* Req. for Recons., Jan. 5, 2006, J.A. 66. While the application discusses the QMP separation as background, it does not assert that the QMP action was unlawful in its "Discussion," *see id.*, J.A. 67–72, posit issues related to the QMP separation as a basis for error, *see id.*, J.A. 66, or request that Coburn's record be amended with regard to these issues, *see id.*, J.A. 64. And the Board's 2007 Decision focuses only on Appellant's MEB claim.

Appellant claims that because the QMP issue was raised in his 2001 application to the Board, and the Board expressly incorporated the record of its 2002 Decision into its consideration of Coburn's 2002 and 2006 applications, the Board "thus preserved the [QMP] issue." Appellant's Br. at 14.

This is a specious argument. The 2001 application and the Board's 2002 Decision – both of which *did* address the Article 15 action and the NCOER – do not form the basis of this appeal. *See Coburn*, 744 F. Supp. 2d at 181. Indeed, even Coburn characterizes his claims as having "accrued . . . August . . . 2003, and March 7, 2007, when the ABCMR issued final decisions on his applications." Compl. ¶ 14, J.A. 26. Furthermore, it is obvious that an agency's mere "incorporation" of a prior case record in a pending dispute, without more, does not indicate that the agency intends to revisit the issues previously resolved in the prior case. Indeed, decisional references to records from prior, resolved cases may help to define and limit the scope of the issues in pending cases.

It is well understood that "[a] reviewing court usurps [an] agency's function [if] it sets aside [an] administrative determination upon a ground not theretofore presented and deprives the [agency] of an opportunity to consider the matter, make its ruling, and state the reasons for its action." *Unemployment Comp. Comm'n of Alaska v. Aragon*, 329 U.S. 143, 155 (1946). We therefore decline to review Appellant's QMP claim because it was not raised with the ABCMR in the administrative actions that are the subject of this appeal.

## C. Coburn's MEB Claims

### 1. MEB Initiation

Army Regulation 635-40 "establishes the Army Physical Disability Evaluation System." Army Reg. 635-40 ¶ 1-1. The regulation sets forth a specific process governing how the Army determines a soldier's medical qualification for continued service. First, "[t]he MTF [Medical Treatment Facility] commander having primary medical care responsibility will conduct an examination of a Soldier referred for evaluation." *Id.* ¶ 4-9. Second, "[i]f it appears the Soldier is not medically qualified to perform duty, the MTF commander will refer the

Soldier to a MEB," *id.*, a group "composed of two or more physician members," Army Reg. 40-400 ¶ 7-3 (2011). Third, if a soldier is referred to a MEB, a MEB is then "convened to document a Soldier's medical status and duty limitations insofar as duty is affected by the Soldier's status," and "[a] decision is made as to the Soldier's medical qualification for retention." Army Reg. 635-40 ¶ 4-10; *see also* Army Reg. 40-400 ¶ 7-1.

Under the applicable regulatory process, a MEB referral follows a medical examination; in other words, *medical examination* and *referral to a MEB* appear to be distinct steps. It also appears that the doctor who completes the medical examination to determine whether to refer a case to a MEB is not one of the doctors who serves as a member of the MEB.

Once a MEB has been initiated, the MEB process generally takes precedence over separation under the QMP: "Except in separate actions under Chapter 10 [Discharge in Lieu of Trial by Court-Martial] and as provided in para 1-33*b*, disposition through medical channels takes precedence over administrative separation processing." Army Reg. 635-200 ¶ 1-33(a). When the MTF commander or attending medical officer

> determines that a Soldier being processed for administrative separation under chapters 7 [Defective Enlistments/Re-enlistments and Extensions] (see sec IV) [Fraudulent Entry], or 14 [Separation for Misconduct], does not meet the medical fitness standards for retention . . . , he/she will refer the Soldier to a Medical Evaluation Board (MEB) . . . . The administrative separation proceedings will continue, but final action by the separation authority will not be taken, pending the results of MEB.

*Id.* ¶ 1-33(b). The QMP is governed by Chapter 19 of the same regulation. *See id.* ¶ 19-1. The parties here do not disagree that Coburn could not have been separated pursuant to the QMP if he was involved with a MEB in a matter that was still pending

disposition.

The Secretary contends that while Dr. Caycedo "initiated" the MEB, Appellee's Br. at 19, "Coburn was never actually referred to the Medical Evaluation Board itself," *id.* at 58. And during oral argument before this court, counsel for the Secretary argued that while there was "no question that the evidence in the record says 'MEB initiated,'" this was simply "loose language to mean the medical disability processing started, not the MEB was referred." Oral Argument at 30:59, 31:30. Under the Secretary's theory of the case, "[t]here is no evidence in this record that the Medical Treatment Facility Commander ever referred anything to a Medical Evaluation Board." *Id.* at 25:48. Instead, the Secretary contends that it was the "medical examination that precedes the MEB referral process" that was terminated here, not the MEB itself. *Id.* at 25:01.

Coburn, in contrast, claims both that a MEB was "initiated" and that he was "referred" to a MEB. Appellant's Br. at 10, 17. Coburn also appears to equate MEB "initiation" with a "referr[al]" to the "Army Physical Disability Evaluation System." *Id.* at 9 (citation omitted). As indicated by the facts recounted in the Background section of this opinion, Appellant makes a compelling case in suggesting that he was referred to a MEB.

In any event, it is clear that the parties disagree over whether Dr. Caycedo terminated Coburn's medical processing before or after he was referred to a MEB. The resolution of this issue influences the analysis of Appellant's claim that his MEB processing was improperly terminated.

The parties agree that the MEB was "initiated." And, as noted above, the record clearly supports this conclusion and, in some instances, suggests Coburn was "referred" to a MEB. The relevant evidence, some of which is outlined in the Background section of the opinion, is fairly extensive. First, the record

indicates that Dr. Caycedo requested that "MEB action on SFC Coburn" be "terminate[d]," clearly implying that Coburn's case had come to involve the MEB process in some form. Caycedo Letter, J.A. 109.

Second, the record also contains an "Individual Sick Slip" from Dr. Caycedo, dated June 3, 2002, on which is written "MEB initiated." Individual Sick Slip, June 3, 2002, J.A. 244.

Third, two official responses to Coburn's allegations that the Army was attempting to separate him while his MEB continued also demonstrate that a MEB had at least been initiated. In July 2002, the Army wrote to a member of Congress, apparently to respond to Coburn's prior complaints to the member that the Army was attempting to unlawfully separate him. The response explains, "Sergeant Coburn's allegation that his unit was trying to separate him from the Army while he was undergoing a medical evaluation board (MEB) board [sic] is unsubstantiated." Storm Letter, J.A. 112. It further states that it was "determined that Sergeant Coburn did not meet medical retention standards . . . ; therefore, he was eligible for processing through the Physical Disability System. On July 2, 2002, he was *referred* to process through the MEB . . . ." *Id.* (emphasis added). The letter concludes that Coburn was "being afforded every legal and medical recourse as he processes through the MEB channels." *Id.*, J.A. 113.

Similarly, in January 2003, the Office of the Inspector General responded to Coburn's allegations that separation orders were unlawfully issued in light of his ongoing MEB processing. The response mentions that a physician had "initiated the MEB," and explains that it had been determined that Coburn "should be retained until the medical process is completed" and "was in the MEB process and the orders should not have been processed for separation." Response to Inspector General Action Req. (Jan. 30, 2003), J.A. 88 (citing Army Reg. 635-200 ¶ 1-33(a)).

Fourth, Coburn's "Physical Profile," issued by Dr. Caycedo, notes "MEB INITIATED." Physical Profile, June 28, 2002, J.A. 245. It also includes a numerical designator of "3" and states that his physical profile is "permanent." *Id.* That numerical designator indicates medical or physical issues that "may require significant limitations," Army Reg. 40-501 ¶ 7-3(d)(3) (2011), and a permanent "3" profile requires "review[] by an MEB physician or physician approval authority," *id.* ¶ 7-4(b). Further, an active-duty soldier with a "permanent" profile who does not "meet the medical retention standards must be *referred* to an MEB." *Id.* ¶ 7-4(b)(1) (emphasis added). As noted, Coburn was described as "not meet[ing] medical retention standards," and thus was "referred" to a MEB. Storm Letter, J.A. 112.

Fifth, in July 2002, Dr. Caycedo noted in a Consultation Sheet that Coburn was "PRESENTLY UNDERGOING MEB" and needed a "FINAL EVALUATION PRIOR TO COMPLETION OF MEB." Consultation Sheet, July 2, 2002, J.A. 255.

Finally, the ABCMR apparently assumed that the MEB process had commenced. In its 2003 Decision, the Board notes that Coburn was requesting in his application that "he be reinstated on active duty in order to complete physical disability processing," and recognizes that Coburn's "MEB was abruptly terminated." 2003 Decision at 2, 6, J.A. 78, 82.

In sum, while there is no doubt a MEB was initiated, there is a question as to whether *initiation* and *referral* are distinct. There is also a question as to whether Coburn was in fact *referred* to a MEB as he claims.

*2. MEB Termination*

A MEB is "convened to document a Soldier's medical status and duty limitations insofar as duty is affected by the Soldier's status"; and it appears that the MEB, alone, is charged

with the duty of making a decision "as to the Soldier's medical qualification for retention" once a case is submitted to it. Army Reg. 635-40 ¶ 4-10. And, as noted above, the applicable regulations indicate that the actions of examination and potential referral to a MEB, *see id.* ¶ 4-9, are separate from a MEB evaluation and decision, *see id.* ¶ 4-10. In other words, the medical examination performed by an attending physician, which may or may not lead to a referral to the MEB, is distinct from a MEB evaluation.

The "termination" of Coburn's MEB as it happened in this case is unfathomable. First, the initiating physician was Dr. Caycedo, and the terminating physician was Dr. Caycedo, acting with the approval of Dr. Schirner. However, there is no indication in the regulations that the referring physician can also serve as one of the physician members of the MEB, and neither party asserts that either Dr. Caycedo or Dr. Schirner served as one of the physicians on the MEB. Second, we can discern nothing in the regulations to indicate how these two physicians (who were not members of a MEB) could terminate Coburn's case once it had been submitted to the MEB process. And, finally, the Secretary's argument that medical information in the record justified the termination of Coburn's MEB process is perplexing, because no final decision had been issued by a MEB.

3.  *The Judgment of the ABCMR Fails for Want of Reasoned Decisionmaking with Respect to the MEB Issue*

The findings of the ABCMR afford little help in understanding the MEB issue. Indeed, the Board's decisions lack coherence and, thus, make it impossible for this court to determine whether the judgments of the Board survive arbitrary and capricious review under the APA. Therefore, the ABCMR decisions fail the test of "reasoned decisionmaking." *See Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 52 (1983).

The ABCMR upheld Coburn's separation, because "[t]he scant medical information available does not indicate that the applicant was medically unfit for retention," and because "[c]ompetent medical authority determined that his medical condition was such that he could be discharged." 2003 Decision at 6, J.A. 82. The ABCMR never explains, however, how the "medical information" before it justified Coburn's termination. Nor does it explain how Dr. Caycedo or Dr. Schirner, who were not members of a MEB, could "terminate" a case that Dr. Caycedo had seemingly referred to a MEB, when no final decision had been issued by a MEB.

The Board also fails to clarify whether Coburn's case actually reached a MEB or instead never left the initial MTF examination phase. The Board references the Army's letter to explain that on "2 July 2002 [Coburn] was *referred* for processing through the MEB." *Id.* at 3, J.A. 79 (emphasis added). But it also points to notes dated November 14, 2002 from the Inspector General's office "indicat[ing] that the applicant worked the system to the point that he was being considered for a MEB; however, the MEB did not override his QMP and he was discharged." *Id.* at 5, J.A. 81. Later, the Board cites the Inspector General's case summary from January 2003 as explaining that Coburn was "undergoing MEB processing" and that a MEB had been "initiated." *Id.*

These various statements from the ABCMR decision, read together, are incomprehensible. An agency's decision need not be "a model of analytic precision to survive a challenge." *Dickson*, 68 F.3d at 1404. And, certainly, we may "uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned." *State Farm Mut. Auto. Ins. Co.*, 463 U.S. at 43 (citations omitted) (internal quotation marks omitted). But we may not "supply a reasoned basis for the agency's action that the agency itself has not given." *Id.* (citation omitted). At the very least, the Board must "provide an explanation that will

enable the court to evaluate the agency's rationale at the time of decision." *Pension Benefit Guar. Corp. v. LTV Corp.*, 496 U.S. 633, 654 (1990); *see also PSEG Energy Res. & Trade LLC v. FERC*, 665 F.3d 203, 208 (D.C. Cir. 2011) ("Among other things, [a]n agency's failure to respond meaningfully to objections raised by a party renders its decision arbitrary and capricious." (alteration in original) (citation omitted) (internal quotation marks omitted)). It failed to do so in this case.

In short, the ABCMR's decision is "utterly unreviewable" and simply lacks "reason[s] that a court can measure . . . against the 'arbitrary or capricious' standard of the APA." *Kreis*, 866 F.2d at 1514–15. Where, as here, an agency's "explanation for its determination . . . lacks any coherence," we owe "no deference to [the agency's] purported expertise." *Tripoli Rocketry Ass'n, Inc.*, 437 F.3d at 77.

*4. Instructions on Remand*

"Where an agency 'has failed . . . to explain the path it has taken, we have no choice but to remand for a reasoned explanation.'" *Dickson*, 68 F.3d at 1407 (alteration in original) (citation omitted). On remand, the ABCMR must reconsider Coburn's case and, in so doing, address, at a minimum, the following questions:

(1) Is a medical evaluation and referral to a MEB under Army Regulation 635-40 ¶ 4-9 separate and distinct from an evaluation and action taken by a MEB under Army Regulation 635-40 ¶ 4-10?

(2) Is it possible for a physician to "initiate a MEB" without necessarily "referring" a case to a MEB? If so, what supports this conclusion? To what extent do initiation and referral overlap with the concept of "physical disability processing"?

(3) Was Coburn's case referred to a MEB, or did Dr. Caycedo mean something else when he wrote "MEB initiated"?

(4) If Coburn's case was *not* referred to a MEB, what in the record and regulations supports this conclusion?  If Coburn's case was not referred to a MEB, on what authority did Dr. Caycedo and Dr. Schirner act when they "abruptly terminated" the MEB?

(5) If Coburn's case *was* referred to a MEB, on what authority did Dr. Caycedo and Dr. Schirner act when they "abruptly terminated" the MEB?  In other words, how could Dr. Caycedo and Dr. Schirner terminate Coburn's MEB when they were not members of the MEB?

### III.  Conclusion

The judgment of the District Court is affirmed in part, vacated in part, and remanded to the District Court with instructions to remand the case to the ABCMR for further proceedings consistent with this opinion.

*So ordered.*